WESTERN LAND & CATTLE Co., Limited, *v.* PLUMB and others.[1]

*(Circuit Court, N. D. Illinois.* May 24, 1886.)

1. AGISTMENT—CONTRACT TO FEED CATTLE CONSTRUED.
   Contract, which provides that contractor shall take certain cattle to his farm; that he shall feed and fatten them there until certain date; that he shall be liable for all losses of such cattle from death, disease, escape, or theft at a fixed price per head; that he waives any lien on said cattle as an agister, or in any other character; that contractee shall sell said cattle; and that contractor shall receive, in full for his services, price realized at sale in excess of fixed sum per head and expenses of sale,—construed not to give contractor title to said cattle nor right to sell them.

2. SALE—BONA FIDE PURCHASER FROM APPARENT OWNER, WHEN PROTECTED.
   A creditor who takes a conveyance of personal property merely in payment of a pre-existing debt is not a *bona fide* purchaser, within the meaning of the Missouri statute for the protection of *bona fide* purchasers from apparent owners in possession. Such statute (Rev. Code Mo. § 2507) provides that, where purchaser of personal property has possession, a condition in the contract of sale for the retention of title in the seller until the completion of the payment of the purchase money is void against subsequent *bona fide* purchasers and creditors, unless such sale is evidenced by written contract executed and recorded as in the case of mortgages of personal property.

3. SAME — UNITING IN FRAUD WITH APPARENT OWNER FORFEITS PROTECTION.
   Laws of Missouri in relation to recording chattel mortgages, or conditional titles to personal property, protect only persons dealing in good faith with apparent owner in possession. They do not protect one uniting with apparent owner in fraud upon true owner.

*McCoy, Pope & McCoy,* for plaintiff.
*R. A. Childs,* for defendants.

BLODGETT, J. This suit was tried before the court without the intervention of a jury. It is an action of replevin, involving the ownership and right to the possession of 79 head of beef cattle. The material facts, as they appear from the proof, are that on or about the eighth of November, 1884, the plaintiff was the owner and in possession of 150 head of beef cattle, designated as Colorado steers, and on that day entered into a contract with one J. W. Moad by which Moad was to take the cattle to his farm in Caldwell and Ray counties, Missouri, and there to properly feed, fatten, and care for them for the purpose of their being profitably marketed by plaintiff; that Moad should be liable for all losses of such cattle from death, disease, escape, or theft at an agreed value of $44.86 per head; that the time of feeding should extend to the first of June, 1885; that the cattle were to be sold or shipped for sale by plaintiff; and that Moad was to receive, as full compensation for his care and feeding of the cattle, all moneys realized by plaintiff on the sale of the cattle over the sum of $44.86 per head, after deducting all costs and expenses of shipment and sale, and Moad expressly waived all lien on the cattle, either as an agister or of any other character. In removing the cattle

---

[1] Edited by Russell H. Curtis, Esq., of the Chicago bar.

from the vicinity of Kansas City, where they were at the time the contract was made, to Moad's farm, eight head escaped, and were subsequently recovered and returned to Kansas City, where they were sold with the knowledge of Moad, and proceeds paid to plaintiff. Seven head were either disposed of by Moad or died, so that on the nineteenth of June there remained in Moad's possession 135 head, and on that day he drove them from his farm in Ray county to Breckinridge, a railroad station a few miles distant, and there delivered the cattle to one J. W. Plumb. Fifty-six head of them, it was claimed, were sold to Plumb, and the remainder, seventy-nine head, were delivered to Plumb as agent of J. D. Cox. Plumb shipped the cattle, on the night of the 19th, by railroad for Chicago, and plaintiff, being notified of the removal of the cattle, caused them to be replevied very soon after their arrival at the stock-yards in this city. A settlement has since been made between plaintiff and Plumb in regard to the 56 head which Plumb claimed to have bought of Moad, and the contention left for trial is only in respect to plaintiff's ownership of the 79 head, which it is claimed had been sold by Moad to J. D. Cox, or to the Caldwell County Bank of Kingston, Missouri, of which Cox was the president and active manager. It also appears that, at the time the contract between plaintiff and Moad was made, the sum of $44.86 per head, which was to be the amount of plaintiff's interest in the proceeds of each when sold, was arrived at by taking $42 as their value per head when the contract was entered into, and computing interest thereon at the rate of 12 per cent. per annum to the first of June, when the cattle were to be sold.

It further appears that for two or three years before the contract in question was made, Moad had been, to some extent, engaged in dealing in cattle; that he had begun with a few thousand dollars' capital, and, while at first successful, his transactions for a year or more before the time this contract was made with plaintiff had been so unprofitable that his original capital and profits had been substantially lost, and for about a year he had been in debt to Mr. Cox, or to the bank of which Mr. Cox was president, to an amount between $4,000 and $5,000, which he had from time to time secured by chattel mortgages on steers, horses, mules, etc., which he had, or claimed to have, in Ray, Caldwell, and other counties in Missouri; that notwithstanding he had so mortgaged such live-stock, Moad had, without the knowledge or consent of Cox, sold the steers which were the most valuable and available portions of the property covered by such mortgages, and applied the proceeds to his own use, and about the twenty-seventh of February, 1885, Moad made a new chattel mortgage, upon the cattle now in question and other farm stock, to the bank to secure his note for $366.60, dated February 27, 1885, and another note of $3,633.50, dated October 31, 1884, which last mentioned note had been secured by a former chattel mortgage on the steers which Mode had sold. No money was paid by Cox or the bank to Moad at the time

this chattel mortgage of February 27, 1885, was taken; but it was either at that time or afterwards verbally agreed between Moad and Cox that, when the cattle were ready for market, Moad should ship them to market in Cox's name, and that, when sold, the proceeds were to be applied on the indebtedness due from Moad to the bank. It also appears, I think, quite satisfactorily from the testimony of Mr. Cox that he knew of Moad's financial embarrassment, and I am also satisfied, from the testimony of Moad and Cox, that Moad understood or knew he had made himself liable to a heavy penalty by selling the steers after he had mortgaged them to the bank, and that his only hope of escaping punishment was by in some way satisfying the debt due from him to the bank; that is, while there is no direct proof in the case that either Cox, or any one in behalf of the bank, made any direct threats of prosecuting Moad for selling the steers he had mortgaged to the bank, yet it is quite clear from the proof that Moad acted upon the assumption that he was in peril of such prosecution unless his indebtedness to the bank was paid. It further appears that the cattle in question were kept, for a couple of months after they came into Moad's possession, upon his father's farm, in Caldwell county, Missouri, and were then moved to a farm in Moad's possession in Ray county, where they were at the time the chattel mortgage of February 27th was given, and where they remained until they were driven to the railroad station for shipment.

It is clear from the proof that neither Cox nor the bank ever advanced any money to Moad after he came in possession of the cattle in question, and that the transaction between Cox, the bank, and Moad was in effect an agreement to turn over these cattle, or the proceeds of them, to the bank, or to Cox for the bank, in payment of an antecedent debt due from Moad to the bank.

It is claimed by defendant that the contract between plaintiff and Moad, when considered in the light of the accompanying facts, must be treated as a sale of the cattle to Moad for $44.86 per head, to be paid when the cattle were sold; that Moad was in effect the purchaser of the cattle, to be paid for at the price named by the first of June, or when the cattle were sold and the proceeds realized.

Upon its face the contract purports to be a feeding or agistment contract; the cattle were to be marketed by the plaintiff; Moad was to receive, for his compensation for the care and feeding of the cattle, all the net money realized by plaintiff from the sale of the cattle over $44.86 per head; and I see nothing in the conduct of the parties, either before or after the contract was made, inconsistent with the plain meaning of the contract. It is true that the proof shows that Moad wanted to buy the cattle, and plaintiff put a cash price upon them of $42 per head. Moad then stated that he had no money to buy cattle with, but had plenty of corn and fodder to feed them, and proposed to buy them on credit, but plaintiff declined to sell them on credit, but proposed to give him a feeding contract in which plaintiff

should retain title to the cattle, and give Moad what the cattle should sell for over $44.86 per head after feeding them to the first of June; and these terms were agreed upon, and embodied in the contract; the right of the plaintiff to market the cattle being fully provided for. It is urged, however, that when the eight head of cattle that escaped between Kansas City and Moad's farm were recovered and brought back to Kansas City, they were, by plaintiff's direction, sold for account of Moad; but the contract provided that Moad should be liable for all cattle that should escape, at the fixed price of $44.86 per head, and when these cattle were recovered and brought back to Kansas City by a man in Moad's employ, they were properly sold for account of Moad. If they had brought more than the stipulated price per head, the surplus would have belonged to Moad. They did not bring any surplus, but there was a balance left due, and Moad paid this balance to the brokers who sold the cattle, thus fully ratifying the sale and application of the proceeds.

It also appears that the plaintiff, during the winter, had occasion to borrow some money from a mortgage and investment company doing business at Kansas City, and placed this contract with Moad as collateral security, and that a clerk of the investment company sent a notice to Moad in May stating that his note would be due June 1st. But the proof shows there was no note given by Moad with this contract, and the contract does not call for any specific sum of money to be paid by Moad; and, although this notice bears the name of J. A. Forbes, the manager of the plaintiff company, who was also the manager of the investment company, yet it is a printed form with a printed signature, and was undoubtedly filled up and sent by some clerk of the investment company who knew nothing of the transaction, and certainly had no right to construe or give a meaning to the contract.

It also appears that in March, Mr. Forbes, the manager of the plaintiff company, wrote a letter to one of his employes, who was then at Moad's place, in which he states that he is sorry to learn that Moad fears he will not make money on the cattle, and suggests whether Moad had not better pick out the best and sell them earlier than was first intended, and thereby reduce the expense and save interest. This reference to saving interest defendant claims is only consistent with the assumption that Moad was a purchaser of the cattle from plaintiff, and was to pay interest on the purchase price. Mr. Forbes in his testimony explains the matter by saying that their cash price for the cattle, at the time the contract was made, was $42 per head; Moad was to feed them till June 1st, and have what the cattle brought over $44.86, which sum was arrived at by computing interest on the $42 per head at the rate of 12 per cent. per annum to June 1st; and if, at his suggestion, any of the cattle were sold before that time, this rate of interest should only be computed to the time when the sale was made and proceeds realized.

The transaction, then, seems to me to be clearly this, and nothing more or less: Plaintiff had the cattle for sale on the Kansas City market at $42 per head, cash. Moad wanted to buy them on credit at that price. Plaintiff refused to sell them to him on credit; but, on his statement that he wanted to buy cattle to feed because he had a large supply of feeding material on hand, proposed to let him have the cattle to feed, upon a feeding contract in which plaintiff should have the right to market them, and out of this proposal grew the written contract now in question. I have no doubt that the true intent of the parties is expressed by its terms; that it was intended to be, as it purports to be, a feeding contract, in which Moad became a mere bailee of the steers in question for the purpose of feeding or caring for them, and that his compensation for the feeding and care was to be what the steers should sell for over the stipulated price per head; that is, Moad was to have the profit on feeding the cattle above 12 per cent. Moad did not understand from the contract itself, nor from the negotiations that led up to the contract, nor from what took place afterwards, that he was the purchaser of the cattle, and had the right to dispose of or sell them.

It is, however, urged that, under the laws of Missouri where the contract was made and was to be executed, the legal effect of the contract was to clothe Moad with the apparent ownership; so that, as between him and those with whom he dealt in regard to the cattle, he is to be deemed the lawful owner, as the contract showing his special or conditional title was not properly recorded. Section 2507, Rev. Code Mo., seems to be the only express provision of the law of that state upon this subject. It declares that "in all cases where any personal property shall be sold to any person, to be paid for in whole or in part in installments, or shall be leased, rented, hired, or delivered to another on condition that the same shall belong to the person purchasing, leasing, renting, hiring, or receiving the same, whenever the amount paid shall be a certain sum, or the value of such property, the title to the same to remain in the vendor, lessor, renter, hirer, or deliverer of the same, until such sum, or the value of such property, or any part thereof, shall have been paid, such condition—in regard to the title so remaining until such payment—shall be void as to all subsequent purchasers in good faith, and creditors, unless such condition shall be evidenced by writing executed, acknowledged, and recorded as provided in cases of mortgages of personal property."

I do not find that this statute, as far as it is applicable to the facts of this case, has ever been construed by the supreme court of Missouri.

The claim on the part of defendant is that Cox is a *bona fide* purchaser of the cattle, because Moad was in possession, and there was no contract or instrument of record showing that his title was conditional; but the supreme court of Missouri, in *Aubuchon* v. *Bender*, 44 Mo. 560, in construing the laws of that state in regard to the rec-

ord of deeds and contracts pertaining to real estate, held that a purchaser who had parted with nothing, but had merely taken a conveyance of real estate in payment of an old debt, was not a *bona fide* purchaser:

"At common law there was no obligation to put upon record a conveyance affecting the title of land; but the duty of registration is now imposed upon the grantee, or the person to whom, or for whose use, the conveyance or covenant is made, and, as in all other cases where a duty is imposed, he who neglects it should suffer the consequences. The object of the requirement is to compel an exhibit of title to facilitate transfers, but principally to guard purchasers against imposition; and hence, if the prior deed is not recorded, a subsequent buyer for good consideration, without notice, will be protected. This protection, always thrown around an innocent purchaser, and to which our statute also expressly entitles him, is founded on the broadest equity. He receives it, not because the prior deed is invalid in itself,—the duty of recording it is not enforced by any such penalty,—but because justice will not suffer a person who omits a plain duty to set up a claim against one who had been led by that omission to invest his money in what he supposed his vendor had a right to sell; but, to entitle him to such protection, he must have parted with something of value, otherwise he is not injured; and such is the spirit, if not the letter, of the statute, and such has been its uniform interpretation."

In the light of this decision, and of many more of the same purport by the federal and the state courts, I am of opinion that the provisions of section 2507 which protect *bona fide* purchasers and creditors who deal with an apparent owner in possession of personal property, only apply to and protect a purchaser who pays a present consideration, or a creditor who trusts or gives credit to such person while in possession. Neither Mr. Cox nor the bank paid any present consideration, nor gave Moad any credit upon the faith of his being the owner of these cattle. On the contrary, there is much in the record to justify the conclusion that Mr. Cox knew that Moad was not the owner of these cattle. The fact that, after he had obtained from Moad the chattel mortgage of February 27th on these cattle, he did not put this mortgage upon record, is to my mind a very suggestive circumstance in support of the view that he relied wholly upon the advantage or hold he had upon Moad by reason of Moad's having sold the steers covered by his former mortgages; and the dealings between Cox and Moad in regard to these cattle satisfy me that Moad was governed by his fears of a prosecution, rather than by any sense of obligation.

I think, too, there can be no doubt that Plumb, to whom Moad delivered the cattle as agent of Cox, knew that Moad was fraudulently and surreptitiously removing the cattle. It is true, he did not say it in so many words; but there was that in his manner of testifying which would justify a jury in inferring much more from what he did not say than from what he said. He was on the watch for the cattle when Moad drove them into Breckinridge; bought 56 head of them without weighing, and in such haste as to be of itself a badge of fraud; and his testimony, as to his unscrupulous practices in starving the

cattle for water, and then allowing them to drink heavily just before they were to be weighed, stamps the character of the man. There can be no doubt of Moad's fraudulent knowledge and fraudulent participation in the transaction. He kept the cattle 19 days beyond the term of his contract, pretending that he preferred to so keep them rather than to have them sold at the then current price, and in the mean time resorted to expedients to get Tunnyhill, the plaintiff's employe who was at the farm, to leave there; and finally, when he did leave, on the 18th, for a two-days absence at Kansas City, he made hot haste to get the cattle shipped before Tunnyhill's return. He knew he had no right to sell them, and the inference is conclusive from the circumstances that he dared not move them while Tunnyhill was at the farm; and yet Moad was made the agent of Mr. Cox and the bank to ship the cattle for them. Acting through agents like Moad and Plumb, and having paid no present consideration, nor parted with a dollar or dollar's worth of value for these cattle, Mr. Cox cannot be deemed a *bona fide* purchaser or creditor for value.

I do not think the case comes within, or is affected by, the laws of Missouri in relation to recording chattel mortgages or conditional titles to personal property, as those statutes were only intended to protect those who deal in good faith with a person in possession of such property as the apparent owner.

The issue is found for the plaintiff.